Our next case is number 2012-1608, HOME PRODUCTS INTERNATIONAL v. United States. Good morning, Your Honors. My name is William Perry from the Law Firm of Dorsey & Whitney, and I'm here representing Cincinnati Harbor in this case. Obviously, the Court has several issues in front of it. Because of the limited time, and let's ask, we are going to rely on our briefs and George Moore's decision on mootness, because CINC has a personal stake in this case. In the limited time available, we wish to address the direct issues on this appeal. Do you concede that there's jurisdiction? Do you concede the jurisdictional issue? I don't concede it, no. I agree with Judge Moore's decision. I'm not conceding that the other side is correct in mootness at all. We still have a personal interest in this case. CIN still exists. It has the ability to export the products to the United States. But it's not in the business anymore? It's not. That's not correct in the sense they have the machinery, etc. I think Judge Moore said it best, which is when you have rates that are so high that you can't export, you've got to do other things to make your living. But that doesn't mean that you're no longer in the business. I thought what Judge Moore did was tie it to the interest of the importers. Well, that's correct, too. But can we stand in the shoes of the importers here? I believe we can. In the sense, first, the competitive relationships between CIN's hardware and the importers are still at issue here. They were at issue at the beginning of the case. They're at the issue at the end of the case. Keep in mind, also, we're looking backwards here. We're looking at exports to the United States that were made during the review period. The importers... What we decide here is going to affect the dumping duty, right, for the payouts transaction? Yes, that's correct. Why isn't that in itself enough to render it not moving? I believe that probably that's the point, yes. I mean, the point you said here, what is it? Namely, the alleged rise in the imports, imposition of its duties on its importers for entries of the merchandise. I mean, a case is usually moved if, all of a sudden, the imports are no longer suspended. They are suspended here. So you're determining the actual duties. And by determining the actual duties, in fact, affecting the relationships of CIN's hardware... So under your theory, even if you never intended to go into business again, you're completely out of it, there wasn't even any speculative possibility that you'd go into business, you could come here and argue on behalf of your customers? I think so. In fact, commerce has taken that position. If you take a look at a case called Coomerant, which we cited in our brief, in that case, the Chinese exporter literally went bankrupt. It was gone. But in that case, the importers were parties. The importers aren't parties here. Well, yes, not in this case, no. But that still, since hardware has... The question is whether the importers still have standing. Yes or no. I mean, even if the importers hadn't shown up, the Commerce Department would have gone forward and conducted the investigation. But that doesn't mean that they're standing to object. I mean, you're not the importers. If the only one with interest left is the importer, is it your position that you can stand here and assert their independent interest? Yes, I believe we can because it affects the competitive relationship between Sense Hardware and its customers. All right. But you don't cite any case for that proposition? Well, she knows half of that. I mean... If you succeed, the dumping duty is going to be changed. Yes. The importers have to pay. And I guess there's nothing in the record to show that they can look back to you to make goods on the dumping duty or that you get the benefit of the reduced duty, correct? No, we don't get the direct benefit of the reduced duty, no. But it does affect our relationship with our importers and whether we can then begin to export again. Go ahead. I should address the mayor. I believe that the... We believe that the Court of International Trade abused its discretion when it comes to exhaustion because we believe that the court abuses its discretion when its decision is clearly unreasonable or arbitrary. In this case, the lower court simply put formal the substance, ignoring the remedial purpose of the anti-dumping statute and ignoring the arguments made in response to the government's affirmative exhaustion defense, including the fact that there is contrary evidence on the record. In determining whether exhaustion is appropriate, the court should decide whether it advances the two main purposes of exhaustion doctrine, protecting administrative agency authority and promoting judicial efficiency. Isn't part of the problem that you waived the exhaustion argument? No, I don't believe that's true. Because keep in mind that the court is saying we should have attacked the Commerce Department's refusal to accept the case brief. We did raise it in passing. But more importantly, exhaustion is an administrative defense. That's the point. If you go... But the first time you were before the court, you did not raise the question of whether it was an abuse of discretion to refuse to consider the brief. No, because we looked upon exhaustion as an administrative defense. The issue is not whether the Commerce Department rejected the case brief or waiver. The issue is whether the application of the exhaustion doctrine was correct in the case in light of the government's affirmative defense and our arguments in response to that defense. As the Supreme Court has determined, exhaustion is an affirmative defense that needs to be raised by the government on appeal in response to plaintiff's moving brief. Now see page 1011 of our reply brief. CIT Rule 8D, Jones v. Brock, Supreme Court, 9-10-9-19-2007 and the Federal Rules of Civil Procedure 8D. Excuse me. Our point is that we set off our argument regarding the financial selection data. The Justice Department, the Commerce Department to the Justice Department said, you've exhausted. We responded to that in our reply brief. We believe that is the way the procedure works here. The exhaustion doctrine is not a decision made by the Commerce Department. It is a decision made by the court. The court has the discretion whether or not to find that exhaustion has taken place. Okay, and the court found that it did not, correct? The court determined that we failed to exhaust our administrative remedies in its discretion. So on appeal, we're arguing that there's been an abuse of discretion because the court didn't consider all of our arguments in our reply brief and in our moving brief and the other issues that are involved here. I mean, we also have a very limited moving brief of 16 pages and no oral argument at all in the case. So, our point was... I mean, in this case also, I believe that Commerce has used the exhaustion defense as a sword by throwing out the case brief and then in effect saying, we, Commerce, do not have to examine all the evidence on the record. We can make a decision of the surrogate financial data without any judicial oversight. Once they say the case brief is gone, that's it. Well, why didn't you file it on time? It was a calendaring error. Unfortunately, we had so many stuff going on. We had an administrative staff that was trying to keep track of the dates and they missed it. I mean, it was a command call. It was due the 15th. We thought it was due the 16th. We filed it the morning of the 16th. We immediately came in and filed a letter to Commerce that we made a mistake. Please accept... And are we supposed to say that procedural rules don't matter? That, you know, they're just supposed to be ignored? Well, I don't think that's true either. But, on the other hand, this is... In the past, Commerce has accepted briefs that were filed a day late. We pulled them out of kitchen and appliance services. We also have a real problem here. What did they say when they accepted the briefs that were a day late? Did they say anything? Not really. We said, no problem. I mean, it was the same thing. It was a calendaring error. We accept it. I mean, this doesn't affect the Commerce Department's proceedings. In those cases, was there a motion to accept the late filing with a good cause showing? Not a motion, but a letter was filed at the Commerce Department. And based on that letter, Commerce accepted the brief. What did they say in the letter? I can't tell you off the top of my head. But I know it was the same reason we gave. It was a calendaring mistake. But did you give the reason to Commerce, or did you just give it to the court? No. We provided the letter to the Commerce Department. The Commerce Department rejected our letter. The letter said it was a calendaring error. Huh? The letter said it was a calendaring error. We gave, yes, in detail as to why we made a mistake. Okay, Mr. Perry, do you want to save your rebuttal time here? Yeah. Yes, sir. Ms. Dunsmore? Good morning, Your Honor. Kerry Dunsmore for the United States. Let me tell you what my concern is here. And it's not what Mr. Perry was talking about. It's about the use of the new labor rate methodology and the refusal to use it in this proceeding, whereas it seems to me that it's been used retroactively in every other proceeding that's been identified here. And I don't see much of an explanation from Commerce as to why the new labor rate methodology was applied retroactively in all these other cases, but not here. Could you address that, please? Absolutely, Your Honor. First of all, I would disagree that Commerce has used the new labor wage rate methodology retroactively in all cases. Mr. Perry does cite some cases where there are many other instances. And he raised the issue in his reply brief, so we haven't briefed it. But there have been other cases. Are those cited in your brief? They're not, because he cited these cases on reply. So I apologize, Your Honor. We'd be glad to provide an additional briefing to the Court if you'd like a list of those. Moreover, the issue in this case has to do with the timing. This case, the final results came out before the new methodology had been adopted by Commerce. And when Mr. Pensarver challenged it, the trial court affirmed the use of the interim labor wage, the multiple country methodology. So although the methodology was adopted while this matter was on remand, it had already been affirmed. The use of multiple countries had already been affirmed by the trial court. Will I say that distinguishes these other cases? Yes, Your Honor. In none of those cases had there been a determination by the Court of International Trade as to the methodology by the time the new methodology was released. That is my understanding, Your Honor. Moreover, on the scope of the remand issue, so is it your position that because the remand was as narrow as it was, and that the judgment included approval of the multiple country formula that had been used in the past, that Commerce didn't have to use the new methodology? Or is it your position that the scope of the remand was so narrow that Commerce could not have used it? I would say that Commerce did not have to, not that it could not. And where do we find the explanation for not using the new labor wage methodology? In the remand results, Your Honor? Yes, where? It is at J.A. 840. The remand is at 328, and this issue is specifically addressed at 335, J.A. 335. Okay, where do we find that on the page? Excuse me, Your Honor, I misspoke. It is at 338 on this page. It specifically, Commerce specifically addressed whether it was preferable to continue to use the multiple country approach in the full paragraph on that page. And Seth said that while the Department has revised its methodology going forward, it has not abandoned the position, and this is stated in the revised amended methodology, it has not abandoned the position that multiple country, the use of multiple countries is better. Yeah, but that's a different rationale than the one you've given us here today. It's not saying, oh well, it's been finally determined by the Court of the National Trade, so it's too late to revisit it. Wait, wait. What it's saying is that we didn't abandon the old methodology, which is not, to me, a very sensible explanation for not using the new one when there are many other cases in which the new one was used. At 337, it explicitly says, it cites the Court having rejected the entire argument that the Department is required to value labor from a single country. Well, it says that, but it doesn't say that that's the reason that we're not revisiting it. You're coming off, I mean, our basic notion of cannery is that you have to stick with what the agency said, and you can't make up a new justification for the agency while the case is on appeal. Well, I'm looking to see where the justification that you articulated today is here. Yes, sir. At the end of that paragraph, accordingly, there's nothing in the remand order that compels the Department to abandon the multiple country methodology that was employed during the process. Well, that's still a problem. That's saying that the remand order doesn't compel us to do this, which is an interesting point, but it's not the same point. Commerce did not say the reason we're not using the methodology retroactively in this case is because we had a final CIT determination. That's the problem. Well, I respectfully disagree, Your Honor. I believe that's what that paragraph is articulating. I think Commerce has articulated two reasons. One, that the trial court has affirmed the use of the single country methodology. And then the secondary methodology, which is that they believe that even with the adoption of the new methodology, that multiple countries is better, and that on the record evidence of this, the fact of this administrative determination, that record evidence supported using multiple countries. And that's what we say in the remand, and that's what we argued in our brief, Your Honor. Was it argued to Commerce below that they were being inconsistent by not applying the new labor rate methodology retroactively in this case, while applying it retroactively in other cases? It was not argued in the final results. Since I raised the issue of changing methodologies, but I do not believe they specifically cited other instances where Commerce had changed. So, are you saying they didn't make the argument that there was an inconsistency? I think they sought the use. No, I understand. They sought the use of the new methodology. But what I'm asking you is, did they say, in connection with their argument that you should use the new methodology, that it would be inconsistent with other cases not to use it retroactively in this case? I do not believe they did, Your Honor. Okay. Do I understand that those other cases where they used the new methodology were cases in which the regression methodology had been used, so that in those cases the methodology that this Court specifically rejected was the one that was being abandoned, not the multiple country methodology? Yes, Your Honor. And moreover, on the facts of the record of this case, the evidence shows that, unlike some of the other cases cited by plaintiffs, there was enough evidence of multiple countries that were economically comparable and were significant producers. And Commerce was able to make a determination using multiple countries, whereas in some of the other cases, subsequent cases, either the trial court or Commerce concluded that there were not enough countries that were economically comparable and significant producers, as is required by this Court's holding in Norvath, to allow them to use multiple countries, whereas here, the record of evidence supported that. And Commerce has never abandoned the notion that multiple countries is better, and that's stated in the new methodology. It's merely concluded as a matter of administration of the statute. They often find that there are not enough countries to do a multiple country methodology. Yes, but the problem is also in adopting the new methodology. Commerce said essentially it will apply it retroactively. No, they set a date, Your Honor, after which they would apply it. After June 10, 2011, to ongoing administrative proceedings where statutory deadlines permit. That's exactly what the new methodology says. The final results in this case predate that deadline. And Commerce reasonably determined that where the trial court had affirmed the use of single countries, that it was not necessary or appropriate to. Well, that's what you said. That's the implication. But they didn't say that expressively. You disagree, Your Honor? Well, no, I mean, if I'm wrong. They did not express it. Yes, okay. That's how you read it. Well, they said it in their decision in this case. Yes. Okay. Turning to the issue of, I'm out of time, but briefly, it seems Harvard waived the issue of surrogate financial statements. It didn't even raise this argument that Commerce unfairly rejected their brief until the motion for reconsideration. Certainly, the trial court did not abuse its discretion in concluding that they felt exhaustive administrative remedies on that issue. Okay, thank you, Ms. Dunsmore. Mr. Eikenson, am I pronouncing that correctly? You are, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Fred Eikenson, attorney for Home Products International. I was intending to just comment on the jurisdictional issue and to rely on what the government counsel had to say about the merits. I just would add, and I do agree with government counsel, but I would add one thing on the merits of the labor rate issue, and that is Commerce, when it changed its methodology, there really was an element of administrative expedience that drove that decision. It felt that it didn't have to go through the process of looking at so many different countries and then screening out so many that didn't qualify as significant producers or countries with similar GNI, gross national income. And as a consequence, it did a lot of work and it narrowed it down to a couple of countries, and the Commerce Department said we can work with a single country. But Commerce never rejected the idea that more is better than fewer, and which is what Ms. Dunford told you. And so I just want to put in our two cents worth on that issue. But our biggest concern is that it would be a little difficult for Commerce now after this proceeding to say, oh, well, we've changed our minds in an individual case, and more is better, and we're not going to use the new labor rate methodology, right? Well, I don't think they've never disagreed that more is better than fewer. Could they use the old methodology in a new case now? Well, not to my knowledge. However, in one case that's currently pending CIT, there were two countries that were left to consider. This is a case called Camel, which we cite in our brief. One of the countries was Bangladesh, which had a very, very low labor rate. That was the country that Commerce used because it was the surrogate country. But the domestics in that case argued that there was another equally applicable country. It was the Philippines. The labor rate was nine times as high. And the chief judge of the Court of International Trade said, while we agree that Commerce is reasonable in its new methodology to set out a prima facie way of identifying the key country, still you have to consider substantial evidence, and you have to consider what evidence detracts from that finding. And the judge was not satisfied that Commerce's decision was correct, and he remanded it to Commerce. But what's that have to do with using multiple countries as opposed to, that sounds like an argument about which country you want to use? Well, it was simply all that the judge was saying was that Commerce's new methodology is on its face reasonable, but it's not final. It's not conclusive, rather. But to answer your honest question, I'm not aware of any other case where since the new methodology was put into place, Commerce on its own has used multiple countries. But they've never disowned the notion that multiple countries provides a better answer than a single country or fewer countries. On the jurisdictional issue, do you agree that Since Hardware can stand here and argue the interests of its importers? Absolutely not. And your question contains a statement which is troubling. When you say its importers, it doesn't have importers. It had importers. Right now, it's out of the business. It's not an exporter. It's not a foreign producer. In the past, it had importers. In the past, it was an interested party, as the statute defines it. And not only that, it also participated in the administrative proceeding and had an absolute right to litigate the Court of International Trade, which it did. But, of course, the law of standing requires a litigant to maintain standing throughout the course of litigation. And here, Since Hardware has ceased to be a producer, Chinese producer, ceased to be a Chinese exporter. So when we look at the interest that this company has in its importers, there are no its importers. Well, let's do this in layers. Let's assume they were still an exporter. Yes. Could they stand here and argue the interests of their importers? I would say they would argue their own interests. They would say – they're not arguing on behalf of their importers. They would say that they have an interest in making certain that their customers in the United States are not burdened with excessive duty. I think that's an exception. Because of the future relationship? Well, because of – not necessarily future relationship, but ongoing relationship. Well, that's what I'm talking about. Pardon? That's what I'm talking about. If there is an ongoing relationship, then – Reducing the duty gives them an interest. So if there's no ongoing relationship, reducing the duty doesn't give them an interest? If there's no ongoing relationship, reducing the duty gives them no interest. They have no interest. Let's say that in this case, a few days after they filed their lawsuit, they made an announcement that we're out of the iron ore business. We're not going to produce anymore. We're not going to export anymore. It's inconceivable to me that that company would continue to have standing to litigate under those circumstances. So what is different in that scenario and what has actually happened? What has happened is since hardware has not said we're out of it forever, they clearly are saying we don't export anymore, we don't produce anymore, and what will it take to get us back in business? They identify such speculative scenarios that it – there's so much case law in this, from the Supreme Court and other – my circuit, D.C. circuit, that suggests that no consideration should be given to these hypothetical, conjectural scenarios at all. So they really are – they don't, in my judgment, don't have any standing anymore. They don't have a relationship with the import community. Well, what happens in these cases where – in the typical case where there's an ongoing plan? Do the importers appear in the case and argue the duty issue, or do they rely on the exporter to argue the duty issue? Excellent question, Your Honor. In some instances, they do appear. If they want to be prudent and protect themselves against a situation that's developed here, they will do exactly what Your Honor suggests. There are cases in which they don't. There are cases in which they don't. And technically, they take their chances. Although, there have been very, very few cases, in my judgment, in my experience, where the foreign manufacturer does disappearance from the business. That's what's happened here. Now, the major importer in this case could very well have been a party. Could have, but he wasn't a party. And so now, Mr. Perry is trying to salvage his import client's rights by pushing the – moving the case on behalf of a foreign manufacturer who really has no interest in the case. Nothing that this court can do can benefit the foreign manufacturer, and nothing that this court can do can hurt the foreign manufacturer. This is a classic definition of movement. Okay. Thank you, Mr. Edgerton. Mr. Perry. Let me ask you one question before you get into what you're trying to address. And that is, did you, in fact, raise before Commerce the inconsistency that you now claim to exist between the treatment of the new labor rate methodology retroactively in other cases, and in this case, would that point it out to Commerce? I think so. I was going to look at it. I know we argued strongly that India should be the primary insurgent country before Commerce. Well, let's do the same thing. Did you? Can you show us? I couldn't find it. Okay. But I also know that we did raise this at the court level. Well, but the problem is, if you didn't raise it before Commerce, it's a... I think we may have. Wait, wait, wait. It's sort of unfair to charge tax Commerce for not responding to an argument that wasn't made. I'm pretty sure we did make it. You can't point it out. I can't point it out right now, off the top of my head, that we did or didn't. But I'm pretty sure we did. I mean, I could come back later on and give you a cite, if that would help. If you wish to send in a letter with the cite, you can do that. Okay. Thank you very much. On the standing issue, just a couple of quick points. The machinery still exists at Sins Hardware. If you're going to send in a letter, do it by Monday, okay? By Monday? Yeah. Okay. The machinery still exists at Sins Hardware. More importantly, it still is an exporter. The antidumping rate is given to the exporter, not the producer. And it can export today if the rate goes up. It could get somebody else's iron tables and export, because the rate is given to the exporter. And there is an ongoing relationship between the importers and Sins. They're talking all the time. But the problem seems to be that you're not financially impacted by the reduction in the rate if you're successful. But I think our relationship with our importers is affected. And if the relationship is affected, that means they can't export anymore. But you don't say in your declarations that you're standing ready, willing, and able to import. And, in fact, you want to go back into this ironing board business. You say you may possibly consider it someday if you get a good result. Well, I think that's a little bit too. I mean, they're saying they're considering it. But the point is they also have all the machinery there. And we gave you pictures of the machinery to show that. So, I mean, this isn't a situation where the company is completely closed down, ceased to exist, no machinery, nothing else. I mean, there's machinery there. We gave you photographs of it. And a statement that, yeah, I'm really thinking of doing this when the rate comes down. But the point is when rates come – the problem is you have that standing issue, the exporter standing issue being addressed at all by us or by the Court of International Trade. The only one that I can remember off the top of my head was Jindal-Taipa that he cited in Judge Moore's opinion. And that was by the Chief Judge. And it was basically the relationships between the exporter and the importers that were important. Just quickly on the labor rate, basically, they did not apply it to our remand situation. Most recently in the PET film case, they did. And in that case, the PET film determination was made in March 2011. Before the Labor and Right Methodology situation took place, Commerce applied it retroactively. The other thing is that in this case, basically, Commerce used export data. But the export data was for manufacture of fabricated metal products except machinery. And said, based on that export data, I think they've got substantial production or not. The only real evidence of production in the country is the evidence we submitted on the record from India. Okay. That's it. Thank you very much, Mr. Perry. The case is submitted. We thank all counsel.